Filed 3/1/24  In re L.M. CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re L.M. et al., Persons Coming Under the Juvenile Court Law.

| | |
|---|---|
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E081532 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ014547) |
| v. | OPINION |
| L.D., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mona M. Nemat, Judge.  Dismissed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie K. Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

I.

INTRODUCTION

L.D. was the prospective adoptive mother of six-year-old Le.M. (Le.) and five-year-old La.M. (La.).  The children were detained from L.D. after the Riverside County Department of Public Social Services (DPSS) discovered L.D.'s husband had sexually molested his niece and a female child of the couple's daycare.  L.D. appeals from the juvenile court's order removing the girls from her custody.[1]  On appeal, L.D. argues that the juvenile court erred and denied her due process rights when it proceeded with the evidentiary hearing without allowing her trial counsel to obtain the delivered services logs.  L.D. also asserts that her claim is cognizable on appeal because the juvenile court advised her to appeal by filing a notice of appeal within 60 days, rather than advising her of the appellate extraordinary writ rights.  For the reasons explained, we dismiss the appeal.

II.

FACTUAL AND PROCEDURAL BACKGROUND

Le. and La. were detained from their mother's custody in May 2022, after then four-year-old Le. was found wandering 100 yards from her home.  Law enforcement located then three-year-old La. alone inside the home, which was less than 150 yards from the Salton Sea.  It was not known how long the girls had been alone in the home.  The girls were placed in protective custody based on exigent circumstances.  Le. was

_____

[1] The biological parents of the girls are not parties to this appeal.  The biological father had been deceased since September 2021.

2

severely dehydrated, unable to keep food or water down, and had to be hospitalized. The treating doctor opined Le. likely had not had water for approximately two days. The girls' mother had lost custody of her other children.

The juvenile court took jurisdiction of the instant matter on July 27, 2022. The girls were declared dependents of the court and removed from their mother's physical custody. Reunification services were denied to the mother.

On May 19, 2022, the girls were placed in L.D.'s home with two of their older half siblings who had previously been adopted by L.D. The biological parents' rights were terminated on November 14, 2022. L.D. was designated as the girls' prospective adoptive parent; her husband was an approved adult living in the home.

In January 2023, DPSS received information that L.D.'s husband had sexually abused their niece G.N. when she was 12 or 13 years old. G.N. reported that L.D.'s husband had touched her private parts and inappropriately kissed her when she lived in their home. When L.D.'s husband told L.D. about G.N.'s allegations, L.D. fainted and he denied the allegations. L.D. and her husband had six children in their home and operated a daycare from the home.

G.N.'s mother is L.D.'s sister. G.N.'s mother contacted L.D.'s husband by telephone with law enforcement present. L.D.'s husband apologized to her and stated that he touched G.N. but not in a sexual manner. G.N. explained that the abuse began with a kiss and one day, L.D.'s husband told G.N. to get undressed. He then put his

3

fingers in her vagina and repeatedly kissed her on the mouth. This occurred multiple times while L.D. and G.N.'s mother were not home.

DPSS interviewed L.D. L.D. explained that she had her husband leave the residence as soon as she heard about the allegations. She noted that the daycare income was her primary source of income and that she lived in the home with her mother, her biological son, three adopted children, and the girls. Two of her adopted children were the girls' biological half siblings. L.D. stated that since learning of the allegations, her husband lived at his parents' home, and that she had closed the daycare and notified the licensing board. When she asked the girls if her husband ever touched them, they stated that he had not. L.D. initially had difficulty believing the allegations because her husband was a quadriplegic and had limited mobility. She noted that her husband's fingers did not work and described them as curled up but reported that his thumbs worked for various tasks. L.D. further asserted that at the time of the alleged abuse, 13 people lived in the home, and she could not understand how this occurred with so many individuals under the same roof.

The girls and L.D.'s other children denied any sexual abuse or inappropriate touching. One of L.D.'s children reported that L.D. said her husband had to move out of the home because G.N. told a lie and made the allegation to get attention. On February 10, 2023, law enforcement informed DPSS that L.D.'s husband had been arrested and that a new victim from their daycare had reported sexual abuse by the husband.

4

On March 3, 2023, DPSS learned that V.O.'s nine-year-old daughter had attended L.D.'s daycare since she was a baby and that on December 20, 2022, V.O.'s daughter informed her mother that L.D.'s husband had touched her buttocks and underneath her shirt approximately two to three times. When V.O. called L.D. to report her daughter's allegations, L.D. questioned how that could be possible as her husband was paralyzed. L.D. and V.O. agreed that this could have been an accident due to L.D.'s husband's disability and that moving forward, L.D.'s husband would no longer hug any of the children.

V.O. further informed DPSS that on January 25, 2023, she had contact with L.D. L.D. informed V.O. and V.O.'s husband that she had closed her daycare on January 23, 2023, because her husband had been accused of sexually abusing G.N. L.D. told them that she could lose her license because she did not report the daycare incident regarding their daughter in December 2022 and asked them if they could report it, but requested to use the date of January 25, 2023, as the incident date. V.O. agreed, empathizing with L.D.'s fear of losing her children. L.D. reached out to V.O. again on January 27, 2023, and informed V.O. that the daycare was going to reopen. L.D. again shared everything that occurred pertaining to G.N., and stated that she needed to get a written statement that G.N. had something mentally wrong with her. L.D. noted that G.N. was always hugging her husband and telling him she loved him, but then "'all of a sudden she says something like this.'" V.O. also noted that L.D. was gathering her husband's medical documents to prove he could not move. V.O. expressed concern to the social worker that L.D. was in

5

denial, especially over her stating that G.N. had something mentally wrong with her and because L.D. had excused away her daughter's disclosure as well.

The social worker visited L.D. at her home on March 8, 2023. L.D. stated that she believed that her husband was innocent of the charges. DPSS was concerned that L.D. continued to defend her husband regardless of the accusations against him. L.D.'s husband blamed G.N. by claiming she kissed him and exposed herself to him, despite acknowledging he failed to report her alleged conduct to L.D. or G.N.'s mother. It appeared that both L.D. and her husband utilized his medical condition to enable his behavior. DPSS was concerned that if L.D.'s husband was granted bail or released from custody that he would likely have access to the children, which posed a credible safety threat.

A notice of intent to remove the children (JV-323 Judicial Council form) was filed on March 13, 2023, alleging DPSS had received a referral that L.D.'s husband was accused of inappropriately touching two minors and that L.D. did not report the acts to law enforcement despite being aware of the information. It was alleged that L.D. had attempted to conceal the disclosures and that due to their ages and developmental needs, the girls were at risk of being sexually abused.

L.D. filed an objection to the girls' removal on March 15, 2023. She claimed that the girls should not be removed from her care because she loved and cared for the girls, and they had academically, socially, and emotionally made improvements and accomplishments while in her care. L.D. explained that the girls were traumatized in the

6

beginning with lots of health and personal problems and in the 10 months that they were in her home they had strongly bonded. L.D. had adopted the girls' half siblings and the girls were loved by their sisters and brother and they felt like they belonged to a family.

The girls were detained from L.D. on March 15, 2023, and placed in a foster home. They were adapting to the home's routine and were sleeping and eating well. However, the girls were observed to respond negatively to the foster parent's husband. When he would attempt to speak to the girls, they would physically attempt to shield one another's bodies from him. This behavior subsided after the first week.

On April 7, 2023, L.D.'s trial counsel filed a petition for access to juvenile case file (JV-570 Judicial Council form). Counsel requested a delivered services log pertaining to the time the girls were placed with L.D. This was approximately a 12-month period, and the services log would allow counsel to prepare for the evidentiary hearing on the removal petition. The petition noted the records were necessary because they would provide insight as to the history of the girls being in L.D.'s care, the nature of the relationship the girls had with L.D., the nature of the relationship between the girls and L.D.'s other children, and the efforts made by L.D. which resulted in the designation as a prospective adoptive parent.

DPSS recommended that the girls be removed from L.D.'s care and that she no longer be designated as the prospective adoptive parent for them. DPSS clarified that only L.D. had been approved as the primary caretaker of the girls and not her husband. L.D.'s husband was merely an approved adult in the home. DPSS requested that the girls

7

be placed in a different prospective adoptive home. The girls visited with their half siblings on a weekly basis with the exception of two missed visits. The siblings were observed to be well-bonded and affectionate with one another. Visitation was appropriate and beneficial for all the children.

At a continued hearing on April 11, 2023, L.D.'s counsel explained that he had not received the delivered services log and requested that the contested hearing on the objection to removal be continued. The juvenile court continued the hearing to May 11, 2023.

At the continued May 11, 2023, evidentiary hearing on the objection to removal, L.D.'s counsel informed the juvenile court that he had not yet received the 12-month delivered services log he had requested. Counsel stated that he believed the services logs were probative "of what is going to transpire here as far as the objection to removal." L.D. was present and assisted by a Spanish language interpreter. The juvenile court responded that it was not aware of the status of the request, that there was no guarantee the request would have been granted, and that under the law it needed to proceed with the hearing. The court thereafter heard testimony from the social worker and L.D.

In relevant part, the social worker testified that there were no concerns regarding L.D.'s care of the girls, the girls appeared to be closely bonded to L.D., and the girls called L.D. "mom." The social worker was aware that L.D.'s husband had moved out of L.D.'s home in January 2023, and that he had been out of the home for six or seven weeks when the notice of intent to remove was filed in March 2023. The social worker

was not aware of any evidence that the girls or L.D.'s other children had been inappropriately touched by L.D.'s husband. The girls' current caretakers were still deciding whether they wanted to adopt the girls. The social worker continued to recommend that the girls be removed from L.D. due to their young ages, lack of verbal skills, and their inability to advocate for themselves. The social worker did not believe L.D. would take protective measures and that it was not in the girls' best interest to be placed back in L.D.'s care due to safety issues. The social worker explained that L.D. had a pattern of not believing the allegations made by other children. If the juvenile court allowed the girls to return to L.D., the social worker would want to ensure that L.D.'s husband would not be allowed into the home or have contact with the girls. This could be accomplished by implementing a restraining order which the social worker believed would be enforced by L.D. The social worker was aware that L.D.'s husband was facing serious criminal charges and that he was out on bail.

L.D. testified that she had been operating the daycare for 14 years and notified the licensing board of the disclosure by her niece "the same day." The daycare was closed from January 23 to January 30, 2023, and L.D. was allowed to reopen the daycare, but an investigation was ongoing. She was still married, but her husband had not been allowed back in the home since January 2023 and would not be allowed in her home. She was receiving services to have her children returned to her care and was taking a class and engaged in individual therapy. L.D. explained that a report concerning V.O.'s daughter was not made because everyone believed it to be an accident and V.O. said not to report

9

the allegations as V.O.'s children loved L.D.'s husband. L.D. remained on good terms with V.O. L.D. explained that V.O.'s parents were the ones who wanted to change the date of their daughter's disclosure.

L.D. did not report V.O.'s daughter's December 2022 allegations to the licensing board until the second allegation was received. She later sent a letter to the board that she "did wrong." L.D. denied asking V.O. for a written statement that G.N. had mental health issues or telling her children that the allegations were not true. When L.D. learned of the sexual abuse allegations, she contacted DPSS, the licensing board, and the parents of the children attending her daycare. L.D. was willing to obtain a restraining order against her husband and include the girls as protected persons on the order.

L.D. testified that she did not know whether the allegations of inappropriate touching by her husband were true. When the court inquired as to the allegations made by G.N., L.D. did believe her niece, but she was waiting for the court's ruling. L.D. noted that her husband can move his arms one at a time and was able to put on a headset with both hands if he was in a wheelchair.

On May 15, 2023, following closing arguments, the juvenile court ordered the girls removed from L.D.'s care. L.D. was no longer designated as the prospective adoptive parent for the girls. The juvenile court determined that L.D. was not very credible in her testimony. The court explained: "I don't fault [L.D.] for wanting to believe her husband, but I find that she was not very credible and forthcoming when asked about the reporting, when she knew about the incident and the December incident

10

and in her own investigation as to the December incident. And I found her being very hesitant on the stand to actually take whatever position she wanted to take. The Court got the impression she was trying to figure out what the right thing to say was as opposed to what the true—her true statements were going to be. [¶] . . . [L.D.] was actually on notice of impropriety in December when the parent of the child from daycare informed her. Rather than taking any protective actions at that time, she had a phone call in which [her husband] was involved. And it was apparently decided that it was an accident. She had a duty to report. She did not report." The court noted that L.D. attempted to conceal reporting until she "basically had no choice" and believed L.D. would stand by her husband. The court noted that it's "concern is the safety and protection of the minors and what's in their best interest" and found that L.D. was not protective of the children. The court explained that the girls lacked adequate verbal skills and they needed more protection than the average child in foster care. The court had serious doubts that L.D. would have had her husband move out had she not had the daycare. The court stated that this was not about protecting her children and instead it was about protecting her business. Accordingly, the court removed the girls from L.D.'s care and authorized one supervised visit between the girls and L.D.

L.D.'s counsel asked for a stay of proceedings so that L.D. could be apprised of her appellate rights. The juvenile court advised the parties present of the right to appeal the court's order by filing a notice of appeal within 60 days of the date of the hearing.

11

On May 30, 2023, the juvenile court denied the petition for access to the juvenile case file as to the girls. The court noted that the evidentiary hearing on the objection to removal had already been conducted.

On June 15, 2023, L.D.'s counsel filed a notice of appeal, indicating the appeal was from the May 15, 2023, order on the objection to removal.

III.

DISCUSSION

L.D. argues that the juvenile court erred when it proceeded with the contested hearing to remove the girls from her home without allowing her attorney to obtain the requested delivered services log and that she was denied her due process right to adequately present evidence. She also asserts that her claims on appeal are cognizable on appeal due to receiving inadequate instructions by the juvenile court and good cause exists as to why she did not timely file a writ petition. DPSS responds that the appeal should be dismissed because L.D. never filed a writ petition to challenge the order removing the girls from her care. Alternatively, DPSS argues the juvenile court correctly determined it was in the girls' best interest to remove them from L.D.

Welfare and Institutions Code[2] section 366.26 generally provides for a hearing to determine whether parental rights to a dependent child should be terminated. Section 366.26, subdivision (n), provides that "at or after a hearing is held under section 366.26, the juvenile court may, if specified conditions are met, designate the

_____

[2] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

12

child's caretaker as a 'prospective adoptive parent'. . . . [¶] Subdivision (n) further provides that a [prospective adoptive parent] must be given notice and an opportunity to object to any decision by a social services agency to remove a child from [their] home. The [prospective adoptive parent] may then object to removal of the child from his or her care.  Upon receiving an objection from a [prospective adoptive parent], the juvenile court must conduct a hearing and determine whether removal of the child from the [prospective adoptive parent's] home is in the best interest of the child."  (*Wayne F. v. Superior Court* (2006) 145 Cal.App.4th 1331, 1334.)

A.  *Appealability*

We first examine whether the juvenile court's order removing the girls from L.D.'s custody is an appealable order.  An order by the court issued after a hearing pursuant to section 366.26, subdivision (n), is not appealable except as provided in subdivision (b) of section 366.28.  (§ 366.26, subd. (n)(5).)  After parental rights have been terminated, an order by the court that a dependent child is to be removed from a specific placement is not appealable "unless all of the following apply:  [¶] (A) A petition for extraordinary writ review was filed in a timely manner.  [¶] (B) The petition substantively addressed the specific issues to be challenged and supported that challenge by an adequate record.  [¶] (C) The petition was summarily denied or otherwise not decided on the merits."  (§ 366.28, subd. (b)(1).)  The restrictions on appealability set forth in section 366.28, subdivision (b), were prompted in part by the case of *In re Harry N.* (2001) 93 Cal.App.4th 1378, where the appeal took 18 months to resolve, at the end of

13

which the child was removed from foster parents and placed with relatives, denying the child the security of a permanent placement for over a year. (*A.M. v. Superior Court* (2015) 237 Cal.App.4th 506, 513 (*A.M.*), citing Assem. Com. on Judiciary, analysis of Sen. Bill No. 59 (2003-2004 Reg. Sess.) as amended June 11, 2003, p. 1.)

A party seeking writ relief must file a notice of intent to file a writ petition within seven days after the post-termination placement order. (Cal. Rules of Court, rule 8.454(e)(4).) Because L.D. did not seek writ review within the period specified by the rules of court, she is precluded from appealing the order removing the children. (§ 366.28, subd. (b)(2).)

We do have limited discretion to treat an unauthorized appeal as an extraordinary writ. (*A.M.*, *supra*, 237 Cal.App.4th at p. 515, citing *Olson v. Cory* (1983) 35 Cal.3d 390, 401 (*Olson*).) "Where all the conditions necessary for issuing a writ of mandate are present, and a refusal to decide the issues raised by an improvident appeal would result in unnecessarily dilatory and circuitous litigation, the court has the power to treat the appeal as a petition for writ of mandate. [Citation.]" (*In re Albert B.* (1989) 215 Cal.App.3d 361, 372-373, quoting *Olson*, at p. 401; see *In re Ricky H.* (1992) 10 Cal.App.4th 552, 563-564 [declining to treat defective appeal as a writ petition].)

Applying the reasoning of *Olson*, in *A.M.*, *supra*, 237 Cal.App.4th 506, this court noted that the notice of appeal under consideration had been filed within the time limit for filing a notice of intent to file a writ petition, that the record was adequate for purposes of writ review, and the social services agency had responded on the merits

14

without arguing for dismissal of the appeal.  (*Id*. at pp. 515-516.)  Thus, filing of the notice of appeal within the time limit to file a notice of intent to file a writ petition and acquiescence by the agency were factors taken into consideration.

Here, unlike *A.M.*, however, all of the conditions necessary for issuing a writ of mandate are not present.  L.D. was present at the hearing under section 366.26, subdivision (n), so the time to file her notice of intent to file a writ petition was limited to seven days.  (Cal. Rules of Court, rule 8.454(e)(4).)  Instead, the notice of appeal was filed 31 days after the court made its removal order.  Also, rather than acquiescing to have the appeal treated as a petition for writ relief, DPSS has argued in its respondent's brief that the appeal should be dismissed because it seeks to challenge a non-appealable order.

Responding to L.D.'s argument and citing to *In re Cathina W.* (1998) 68 Cal.App.4th 716 (*Cathina W.*), DPSS further asserts that L.D. has provided no authority that the current matter should be treated similarly to the situation where a parent is not provided with notice of their right to file a writ petition to challenge an order setting a section 366.26 hearing.  In *Cathina W.*, the Court of Appeal concluded the mother was entitled to review of the juvenile court's order setting the 366.26 hearing on appeal from the subsequent order terminating her parental rights because the mother was not given an oral or written writ advisement.  (*Cathina W.*, at pp. 722-725.)  In that case, the mother did not attend the hearing where the court set the 366.26 hearing.  (*Cathina W.*, at pp. 722-723.)  The court clerk belatedly mailed the advisement to the mother four days

15

after the order setting the section 366.26 hearing and misstated the date of that order by months, which effectively misinformed her of the deadline for filing the required notice of intent to file a writ. (*Cathina W.*, at pp. 722-723.) In addition, the written writ advisement was returned to the court as undelivered with the mother's new address and the court clerk did not remail the notice to the mother at the new address. (*Ibid.*) The court found that "the juvenile court, through no fault of the mother, failed to discharge its duty to give her timely, correct notice, as required by [former] California Rules of Court, rule 1462(c)(3)(I)," and under those circumstances, held relief was warranted. (*Cathina W.*, at p. 722.)

The good cause argument does not aid L.D. Neither section 366.28 nor the California Rules of Court implementing section 366.28 contain any mandate that the juvenile court expressly advise the parties of the writ petition requirement. Therefore, noncompliance with the section 366.28 writ requirement is not excused by the juvenile court's failure to give L.D. and her counsel such an advisement. (*A.M.*, *supra*, 237 Cal.App.4th at pp. 514-515.) The fact that the juvenile court did not give writ notice requirements to L.D. following the removal order at the May 15, 2023, hearing does not constitute good cause for her failure to file a timely notice of intent to file a writ petition. Because L.D. has not shown extraordinary circumstances warranting treating her purported appeal as a petition for writ relief, her appeal must be dismissed.

B. *Merits of L.D.'s Appeal*

Even if we were to reach the merits of L.D.'s arguments on appeal, she has not shown the court's decision to remove the girls from L.D.'s custody was an abuse of discretion.

As previously noted, section 366.26, subdivision (n), "provides for a hearing to review an agency's decision to remove a child from the home of a prospective adoptive parent." (*State Dept. of Social Services v. Superior Court* (2008) 162 Cal.App.4th 273, 284.) If the removal is undertaken under emergency circumstances, to alleviate an immediate risk of physical or emotional harm, the agency may remove the children prior to holding the hearing. (§ 366.26, subd. (n)(4).) "The juvenile court has the authority and responsibility to determine whether removal from the home of a prospective adoptive parent is in the child's best interests. (§ 366.26, subd. (n)(3)(B).) If a prospective adoptive parent objects to the child's removal from the home, [DPSS] must prove by a preponderance of the evidence that removal from the prospective adoptive parent is in the child's best interests. This standard applies whether [DPSS] has filed a notice of intent to remove the child under section 366.26, subdivision (n)(3), and the child is still in the home of the prospective adoptive parent, or [DPSS] has removed the child from the home on an emergency basis under 366.26, subdivision (n)(4), as here. Under either circumstance, the juvenile court determines whether the proposed removal of the child from the home is in the child's best interests, and the child may not be removed from the

17

home unless the court makes that finding.  (§ 366.26, subd. (n)(3)(B).)"  (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 45, italics omitted.)

We review the juvenile court's determination of the children's best interest for abuse of discretion, meaning we will not disturb the court's ruling unless its decision is arbitrary or capricious.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)  A due process claim is a legal question to be reviewed de novo.  (*In re A.B.* (2014) 230 Cal.App.4th 1420, 1434.)

Here, the juvenile court made an express finding based on the totality of the information that it was not in the girls' best interest to remain in the custody of L.D. L.D. argues that due process required the juvenile court to permit her an opportunity to present evidence, such as the delivered service logs, regarding the social worker's investigation and rebut the social worker's testimony.

"The essential characteristic of due process in the statutory dependency scheme is fairness in the procedure employed by the state to adjudicate a parent's rights."  (*In re James Q.* (2000) 81 Cal.App.4th 255, 265.)  "Due process guarantees '"notice and opportunity for hearing appropriate to the nature of the case."'"  (*In re Jesusa V.* (2004) 32 Cal.4th 588, 601, italics omitted.)  "But due process also is a flexible concept, whose application depends on the circumstances and the balancing of various factors."  (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 757.)  Further, the "due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court."  (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 817 (*Jeanette V.*).)

According to L.D.'s petition for access to the juvenile case file, L.D.'s counsel requested the delivered services log to show evidence of L.D.'s relationship and bond with the girls, as well as the bonds formed between the girls and L.D.'s children. Despite not having the delivered services log, the record shows that L.D. presented this type of evidence at the contested removal hearing. Evidence of the girls' relationship with L.D. and her children was presented at the hearing. There was no dispute concerning L.D.'s bond with the girls and the girls' bond with L.D.'s children. There was also no dispute as to L.D.'s care of the girls and their developmental and emotional progress while in L.D.'s custody. Hence, the juvenile court did not deny L.D. due process by proceeding with the removal hearing without the delivered services log because it did not rob the court of "relevant evidence of significant probative value." (*Jeanette V.*, *supra*, 68 Cal.App.4th at p. 817.) In other words, there was no prejudice to L.D. in proceeding with the hearing without the delivered services log or not providing the services log because evidence of the relationship L.D. and her children had with the girls was entered into evidence.

We reject L.D.'s claims on appeal that the delivered services log would provide necessary information pertaining to the investigation, that the court's finding that she was not protective of the girls was not based on complete information, and that she was prevented from presenting evidence regarding the social worker's investigation and the ability to rebut the social worker's testimony. These reasons were not stated in her petition for access to the juvenile case file or during the removal hearing. "A party may not assert theories on appeal which were not raised in the trial court. [Citation.]" (*In re*

19

*Dakota H.* (2005) 132 Cal.App.4th 212, 222.)  Furthermore, the fact that the social worker who testified was not the social worker who investigated the allegations does not mean an error occurred.  The social worker who testified was the social worker L.D.'s attorney called as a witness.  L.D.'s counsel did not call as a witness the social worker who conducted the investigation.  Her attorney was not denied the opportunity to call another social worker as a witness or precluded from calling the investigating social worker as a witness.  Moreover, evidence from the investigating social worker is in the record.

More importantly, the record shows that removing the girls from L.D.'s custody was in their best interest.  The social worker testified that she did not believe L.D. would take protective measures and that L.D. had a pattern of not believing allegations made by the other children.  After G.N. made her disclosure, L.D. believed that something was mentally wrong with G.N. and she did not believe the allegations against her husband.  She also excused away V.O.'s daughter's disclosure by noting her husband's medical condition as a reason that it was just a misunderstanding or an accident.  L.D. had also discussed her husband's criminal charges with her children and led them to believe that the allegations were a lie.  Furthermore, L.D. did not report the December 2022 allegations made by V.O.'s daughter until she "basically had no choice," as noted by the juvenile court.  In addition, L.D.'s husband was released on bail and there were concerns that L.D. would allow unmonitored access to the children without DPSS's intervention.  The totality of the circumstances demonstrated that there were safety concerns for the

20

girls and that it was not in their best interest to remain in L.D.'s custody. On this record, if we were not dismissing the appeal, we would affirm because the court's removal order was not an abuse of discretion and there was no due process violation by proceeding with the removal hearing without the delivered services log.

## IV.

## DISPOSITION

The appeal is dismissed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON _____

J.

We concur:


McKINSTER _____
        Acting P. J.


FIELDS _____
                J.

21